# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IMMANUEL BAPTIST CHURCH, an Illinois not-for-profit corporation, | CASE NO. 17-CV-00932 |
| Plaintiff, | |
| | Honorable Judge |
| CITY OF CHICAGO, an Illinois municipal corporation, | |
| Defendant. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Immanuel Baptist Church, an Illinois not-for-profit corporation ("Church"), by and through its attorneys, complains against the Defendant, City of Chicago, Illinois, a municipal corporation, ("City") as follows:

### INTRODUCTION

It is the Church's hope that this be a friendly lawsuit serving to help the City cut through the morass, confusion, and contradictions of its zoning ordinance, Planned Unit Development (known as Planned Developments – "PDs"), administrative interpretations, and complex procedures. The Church will explain how federal law can be used to solve Chicago's problem.

## NATURE OF THE CASE

1. This case is about how the City of Chicago imposes more demanding parking requirements on religious assembly uses than on non-religious assembly uses.

2. Although the Church has done all that it could to meet what it considers unnecessary demands, it has been unable to satisfy the City's increased parking requirements placed on it as a religious assembly use.

3. On its face, the City's zoning ordinance prevents religious assembly uses, like the Church in this case, from operating a religious assembly unless it satisfies an eight (8) seat to one (1) parking space ratio requirement. At the same time, similar secular assembly uses have less demanding parking ratio requirements and some have no parking ratio requirements at all.

4. On its face, the City's ordinance treats religious assemblies, like churches, on unequal terms with nonreligious assembly uses in violation of the "Equal Terms" provision of RLUIPA, 42 U.S.C. 2000cc(b)(1); see also *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 272 (3d Cir. 2007) (Summary judgment entered on church's equal terms claim where city treated churches on less than equal terms with theaters.).

5. As applied, the City has imposed its land use regulations in a manner that treats similarly situated uses differently in violation of the Equal Protection Clause of the

United States Constitution. *Cleburne. Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

## PARTIES

6. Plaintiff, Immanuel Baptist Church, is an Illinois not-for-profit corporation founded in 1994.

7. Defendant, City of Chicago, Illinois, is a municipal corporation located in Cook County, Illinois.

8. Defendant, through its City Council, is responsible for the enactment and enforcement of the ordinances and actions challenged herein.

## JURISDICTION AND VENUE

9. This action arises under, *inter alia,* the Fourteenth Amendment to the Constitution of the United States and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") 42 U.S.C. § 2000cc 1, *et seq*.

10. This Court has jurisdiction over the subject matter of this action by virtue of U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (authorizing declaratory relief); and 28 U.S.C. § 2202 (authorizing injunctive relief).

11. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 1402(a) and 5 U.S.C. § 703.

## BACKGROUND

### I. Background of the Church and Property

12. The Church began operating in Chicago's Rogers Park neighborhood on September 4, 1994. **Ex. A, Carter Declaration at ¶ 2**.

13. For the next few years, the Church continued to meet in various places, including two theaters in the Edgewater neighborhood. *Id*. at ¶ 3.

14. In approximately 1997, the Church began renting space from the Seminary Avenue Community Church located at 1110 W. Lill Avenue, Chicago, IL 60614. The Church continued renting at that location for eight years. *Id*. at ¶ 4.

15. Pastor Nathan Carter, the Church's current pastor, assumed leadership of the Church in 2004. *Id*. at ¶ 1.

16. In August of 2005, the Church felt God's call to move to the UIC neighborhood of Chicago with the vision of being a local neighborhood church. Several of the Church's original members also moved to the area. *Id*. at ¶ 5.

17. The Church then met at the former Duncan YMCA located at 1001 W. Roosevelt Road, Chicago, IL 60608 from August 2005 to January 2007. *Id*. at ¶ 6.

18. After leaving the Duncan YMCA, the Church rented from the Chicago Hope Academy located at 2189 W. Bowler Street, Chicago, IL 60612 for six months. *Id*. at ¶ 7.

19. The Church left Chicago Hope Academy after those six months and relocated to a storefront located at 1417 W. Taylor Street, Chicago, IL 60607 and continued meeting there for the next four years. *Id*. at ¶ 8.

20. In August 2011, the Church began meeting at 1443 W. Roosevelt, Chicago, IL 60608 (the "Property") where it meets to this day. The Church has approximately 60 members. *Id*. at ¶ 9.

21. The Property, shown below in Google Earth® aerial and street view (not including the three-flat on the right), is approximately 3,900 square feet and consists of a worship center and classrooms. *Id*. at ¶ 10.





22. The Property has no onsite parking but the surrounding neighborhood consists mostly of vacant lots. On-street parking is widely available throughout the week. *Id*. at ¶ 11.

23. On November 16, 2012, the City granted the Church an occupancy permit for 146 persons, although its weekly adult attendance is about 80 persons. *Id*. at ¶ 12.

24. The Church currently leases the Property from Almarie Burton ("Owner") at $2,700.00 a month. *Id*. at ¶ 13.

25. The Property was previously used for several years by another church called the No Limit Christian Center. *Id*. at ¶ 14.

6

## II. The Church Attempts to Buy the Property

26. After years of changing locations and renting facilities, the Church decided it was time to purchase a property of its own. Accordingly, the Church reached an agreement with the Owner to purchase the Property and the deal was ready to close in June 2016. *Id*. at ¶ 15.

27. The Church was assured by Alderman Jason C. Ervin and Chicago Zoning Plan Examiner Noah Szafraniec that it would not have problems with zoning because of its pre-existing use. The Owner also received a letter from the Bureau of Planning and Zoning indicating that the Church is a permitted use at the Property. *Id*. at ¶ 16.

28. Before the deal could close, however, the Church's lender required a determination regarding the legal requirement for parking at the Property and contacted Noah Szafraniec concerning the same. Because Mr. Szafraniec was out of town, the lender was referred to Assistant Commissioner Patrick Murphey. *Id*. at ¶ 17.

29. Despite the previous assurances the Church received, on July 26, 2016, Mr. Murphey informed the Church's lender that "a church could not be established at [the Property] without the required parking; . . . ." *Id*. at ¶ 18.

30. Mr. Murphey informed Pastor Carter that while the 2011 Opinion Letter did mean that the Church is an allowed use at the Property, the Church still needed to meet the City's parking requirements. Mr. Murphey also indicated that he could find no

evidence that there was ever a legal establishment of a religious assembly at the Property. *Id*. at ¶ 19.

31. The City insisted, and continues to insist, that the Church have one (1) off-street parking spot for every eight (8) seats. *Id*. at ¶ 20.

32. Pastor Carter then began conversations with the Chicago Housing Authority ("CHA") regarding unused parking it owns within 600 feet[1] from the Property. The CHA indicated that an agreement would be possible but, due to its regulations, any lease could only be for a maximum of 364 days at a time. *Id*. at ¶ 21.

33. Mr. Murphey told Pastor Carter that a lease for 364 days was insufficient and added, despite the fact that the Church is a permitted use, that the City must "determine if a religious assembly use is something it wants to promote on a commercial corridor such as Roosevelt Road." *Id*. at ¶ 22. Mr. Murphey made a similar comment the day after, stating that, "we will review if the continued presence of a religious assembly facility along Roosevelt Road in this block, and the associated parking, are appropriate." *Id*.

34. On August 10, 2016, attorney Richard Baker conferred with Mr. Murphey via email regarding this matter. Mr. Murphey stated that any lease for parking with the CHA would need to run either "in perpetuity or, at the very least, for the duration of

---

[1] Chicago's Zoning Ordinance requires that "shared parking must be located within 600 feet walking distance of the shared parking, measured from the entrance of the use to the nearest parking space within the shared parking lot." Section 17-10-0704.

8

the lease for, or the duration of the existence of, the use served; or, possibly for a term as low as ten years, depending on the circumstances." *Id*. at ¶ 23.

35. Mr. Murphey again reiterated, despite the Church being a permitted use on the Property, that the City "is as yet unconvinced that it supports a non-commercial use of this type along this portion of Roosevelt Road." *Id*.

36. On September 20, 2016, attorney Richard Baker and a Church member met with Mr. Murphey and Noah Szafraniec to discuss this matter. The City raised several concerns regarding the proposed parking arrangement with the CHA including, the length of lease and the maintenance of the lot. *Id*. at ¶ 24.

37. Pastor Carter then explored a parking agreement with a neighboring retirement facility. The retirement facility, however, did not have any spots available. *Id*. at ¶ 25.

38. Pastor Carter also reached out to the CHA about renting parking spaces from the Jane Addams Family Resource Center, located at 1254 S. Loomis St, Chicago, IL 60608, and the Grace Abbot Center located at 1324 S. Loomis Street, Chicago, IL 60608, but the CHA did not want to enter into any shared parking agreements on these lots. *Id*. at ¶ 26.

39. The Church also sought the support of other neighbors. On December 12, 2016, Pastor Carter sent a letter to Temple Wisdom, owner of an undeveloped lot adjacent to the Property, regarding development of that lot into parking space. The Church offered to assist in construction and maintenance in exchange for long-term lease. The Church

9

also considered purchasing the lot. Temple Wisdom, however, refused to sell the lot and also declined to work with the Church. *Id*. at ¶ 27.

40. Despite the Church's best efforts, it has been unable to work out parking arrangements with any of its neighbors, either through purchase of land or a shared parking lease. *Id*. at ¶ 28.

41. Throughout this ordeal, the Church has maintained the strong support of Alderman Jason C. Ervin who submitted a letter in support of the Church to the Department of Planning and Development. *Id*. at ¶ 29.

42. Nevertheless, the City would not relent from its parking demands, thus prohibiting the Church from buying and operating the Property as a church. *Id*. at ¶ 30.

## THE CHURCH'S RELIGIOUS EXERCISES AT THE PROPERTY

43. Since its founding in 1994 and its tenure at the Property since 2011, the Church has conducted, and still intends to conduct, the following ministries and religious exercises, all of which are compelled by and integral to the sincerely held religious beliefs of the Church and its members:

   a. weekly assembly of the congregation to worship (Hebrews 10:25);

   b. weekly preaching, including speech relating to personal morality, God, social, cultural and political issues (2 Timothy 4:2);

   c. pastoral counseling for the disturbed, lonely and bereaved (Acts 20:28);

   d. prayer meetings (Acts 1:13-14);

   e. singing and musical performances (Psalms 81:1-2);

     f.  baptisms, weddings, and communion (Matthew 28:19; Luke 22:19);

     g.  Bible studies (Psalm 110, 2 Tim. 3:16);

     h.  service projects for members of the congregation, the poor, youth, and the general community (James 1:27);

     i.  evangelism - sharing the Christian message and encouraging others to believe in Jesus the Messiah, particularly those who visit the church meetings (Matt. 28:16-20); and

     j.  financial giving to support the Church and its ministries to the poor and to the members in need (Mal. 3:8-10).

*Id*. at ¶ 31.

## THE CITY'S ZONING REGULATIONS

44. The zoning and administrative regulations applicable to the Property are dispersed within a regulatory scheme that is complex and at times contradictory. For the purposes of this Complaint, the relevant regulations are as follows:

45. The City divides its zoning into multiple districts: residential districts, business and commercial districts, downtown districts, manufacturing districts, special purpose districts, and overlay districts. These districts are further divided into numerous other sub-districts.

46. In addition to the districts enumerated above, the City also maintains "Planned Developments" ("PDs") which the City states are "required for certain projects to ensure adequate public review, encourage unified planning and development, promote economically beneficial development patterns that are compatible with the character of

existing neighborhoods, allow design flexibility, and encourage the protection and conservation of the city's natural resources."

https://www.cityofchicago.org/city/en/depts/dcd/provdrs/planning_and_policydivision/svcs/planned_developmentdesignations.html. **Ex. B, Planned Development**.

47. The Property is located within one of these PD districts, namely, the PD 896 District. PD 896 was originally enacted in 2003 and then comprehensively amended in 2007.

48. PD 896 is divided into fourteen (14) subareas. Pursuant to the City's Subarea Map, the Church is located within Subarea B. **Ex. C, Subarea Map**.

49. According to the City's Permitted Uses Table, churches are expressly listed as permitted uses within Subarea B in the PD 896 District. **Ex. D, Use Table**. PD 896 further provides that "Any uses existing on the Property as of the date of adoption of this Planned Development shall be allowed to be maintained until the Applicant of the Affiliates undertake redevelopment . . . ." **Ex. E, PD 896 Reg**.

50. The Property is also located within the City's Roosevelt/Racine Tax Increment Financing (TIF) District.[2] The City defines a TIF as "a special funding tool used by the City of Chicago to promote public and private investment across the city." https://www.cityofchicago.org/city/en/depts/dcd/provdrs/tif.html. **Ex. F, TIF Definition**.

---

[2] Although not controlling, the TIF does influence zoning decisions within its jurisdiction.

51. The goal of the Roosevelt/Racine TIF is to facilitate the "redevelopment of the area as a mixed-use and mixed-income residential neighborhood with convenient commercial service enterprises." **Ex. G, TIF**.

52. In addition to the PD 896 District and the TIF, the Property also falls under the Roosevelt Square Master Plan commissioned by the CHA. The Master Plan lists among its goals: "recognize and build upon existing assets" and "increase diversity of land uses." The Master Plan calls for land use to be primarily residential and calls for "flexibility in zoning." The Master Plan further provides for civic institutions and community centers. **Ex. H, Master Plan.**

53. The City's parking requirements, which are the subject of this Complaint, are not found within any of the above mentioned regulations but in a separate section of the Chicago Zoning Ordinance ("Ordinance").

54. Chapter 17-10 of the Ordinance regulates parking and loading within the City. Section 17-10-0207, pertaining to off-street parking, separates different uses into twenty-three (23) "Parking Groups." **Ex. I, Ordinance**. These parking groups provide for various levels of parking requirements depending on the specific use.

55. Religious assemblies have their own parking group, Group I, which specifies an eight (8) to one (1) ratio of seats to parking spaces. *Id*. at §17-10-0207-I.

56. Other assembly uses, however, have less demanding requirements and, in some cases, no requirements at all:

13

- Entertainment and Spectator Sports: 1 space per 10 persons; none for live theater venues with less than 150 seats

- Cultural Exhibits and Libraries: None for first 4,000 square feet then 1 space per 1,000 square feet

*Id*. at §§ 17-10-0207-P, 17-10-0207-F.

57.  The City, therefore, treats religious assembly uses and secular assembly uses disparately, imposing stricter parking requirements on religious assemblies than on certain non-religious uses.

## COUNT I
## VIOLATION OF RLUIPA, 42 U.S.C. 2000cc(b)(1)
## EQUAL TERMS PROVISION

58. The allegations contained in all preceding paragraphs are incorporated here by reference.

59.  The Property only seats a maximum of 146 persons and the City requires no parking whatsoever for "live theater venues" with less than 150 seats.

60. The Property has less than 4,000 square feet and the City requires no parking whatsoever for cultural exhibits and libraries for the first 4,000 square feet.

61. Section 2(b)(1) of RLUIPA prohibits the City from treating a religious assembly use less favorably than a non-religious assembly use:

> (1) Equal Terms
> No government shall impose or implement a land use regulation in a manner that treats a *religious assembly or institution* on less than equal terms with a *nonreligious assembly or institution*. (italics added).

14

62. By treating churches on less than equal terms with non-religious assembly uses like theaters and libraries, the City's Ordinance, on its face, violates RLUIPA's equal terms provision.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT II
## EQUAL PROTECTION CLAUSE OF
## THE FOURTEENTH AMENDMENT

63. The allegations contained in all preceding paragraphs are incorporated here by reference.

64. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that the government treat similarly situated assembly uses equally as set for in *Cleburne*. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

65. The Church in this case is similarly situated with other assembly uses which, as explained above, the City treats more favorably.

66. Because the City does not treat similarly situated assembly uses equally, the City violates the Equal Protection Clause of the Fourteenth Amendment.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

**PRAYER FOR RELIEF**

Although a dispute over parking may seem trivial, this case concerns nothing less than the Church's fundamental civil rights. This small congregation seeks nothing more than to have a permanent place to worship. Having done all it could to find an affordable and suitable property for worship, and having finally found one, the City is now prohibiting it from purchasing the property and establishing a permanent home. Accordingly, the Church sees no alternative apart from Court ordered relief.

**WHEREFORE**, the Immanuel Baptist Church, respectfully requests relief as follows:

A. Declare that the City's Ordinance violates the Equal Terms provision of the Religious Land Use & Institutionalized Persons Act, 42 U.S.C. 2000cc, *et. seq*. and the Equal Protection Clause of the Fourteenth Amendment;

B. Enjoin the City, its officers, agents, employees, attorneys and all other persons acting in active concert with it, from enforcing its Ordinance, both facially and as applied to the Church, and from preventing or attempting to prevent the Church from using or purchasing the Property as a church or requiring any parking requirements;

C. Award damages for violation of the Church's constitutional and statutory rights and for the injuries and unlawful burdens it has incurred;

D. Award the Church its costs and expenses of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. 1988, and other applicable law;

E. Grant such other relief as this Court deems appropriate.

Respectfully submitted this 3rd day of February, 2017.

**IMMANUEL BAPTIST CHURCH**

By: /s/ John W. Mauck
   One of their Attorneys

John W. Mauck, Esq.
Sorin A. Leahu, Esq.
**Mauck & Baker, LLC**
One N. LaSalle St., Suite 600
Chicago, Illinois 60602
Telephone: 312-726-1243
Facsimile: 866-619-8661
jmauck@mauckbaker.com
sleahu@mauckbaker.com
*Counsel for Plaintiff*