## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IMMANUEL BAPTIST CHURCH,

Plaintiff,

v.

CITY OF CHICAGO,

Defendant.

Case No. 17-cv-0932

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Immanuel Baptist Church sued the City of Chicago alleging that the City's parking regulations violate the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (2000) and deny the Church equal protection under the Fourteenth Amendment. The City moves to strike the expert report of the Church's putative expert, Reverend Jonathan W. Rich, and to bar his testimony from trial or other proceedings in this matter. [156]. For the following reasons, the City's Motion [156] is denied.

### I.    Background

Rev. Jonathan W. Rich is the District Superintendent for the Midwest District of the Christian and Missionary Alliance in Bloomingdale, Illinois. (Rich Rep. (Dkt. 156-2) at p. 1). He proffers his March 4, 2020 report to "present and affirm the negative impact upon church health and vitality when there exists a significant level of uncertainty or ambiguity concerning the continued use or permanence of facilities used for weekly church worship, teaching and service ministries" and to "affirm the

negative impact upon church health and vitality when these worship and teaching facilities are ill-repaired and ill-kept." (*Id*.) Rev. Rich opines that "the City of Chicago Parking Regulations caused undue delay for the [Church's] purchase of the 1443 W. Roosevelt property," resulting in both "financial damages" and "non-financial damages." (*Id*. pp. 12-13).

Based on data from three other churches, he opines that had the Church not been "hindered by the [City] Parking Regulations…it is exceedingly likely that [the Church] would have grown in worship service attendance by at least 20% each year." (*Id*. p. 8). He further opines that the Church "was almost certainly deprived of at least $125,834 for those two years, 2017 and 2018 that the Chicago parking requirements prevented them from completing the purchase and renovations of the building." (*Id*. p. 9). It is his professional opinion that "these deplorable conditions in conjunction with the day to day uncertainty concerning the eventual purchase of the property led to numerous people deciding to leave the church which significantly impacted the numerical growth of the church and its viability." (*Id*. p. 11). The City now moves to exclude Rev. Rich's report and testimony in this case.[1]

---

[1] No jury demand has been filed in this case and the parties' September 2019 joint status report confirms there has been no jury demand. (Dkt. 111 at 3). Any trial will be a bench trial. Following dispositive motions, the Court also may modify the ruling herein based on the expert's testimony at trial. *See Estate of Stuller v. United States*, 811 F.3d 890, 895 n.3 (7th Cir. 2016) ("In the context of a bench trial…[w]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.") (cleaned up).

## II.    Standard

Under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the requirements of Federal Rule of Evidence 702 must be met before an expert can testify. The court evaluates the expert's qualifications, reliability of the methodology, and relevance of the testimony: "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal citations and quotations omitted). District courts have "significant discretion under the flexible *Daubert* inquiry." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 818 (7th Cir. 2012). The burden is on the party seeking to admit the expert to show by a preponderance of the evidence that the expert meets the requirements of Rule 702 and *Daubert. Gopalratnam*, 877 F.3d at 782.

Because "there are many different kinds of experts, and many different kinds of expertise, . . .the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175 (1999) (quoting *Daubert*, 509 U.S. at 591). With regard to reliability, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted). While the

*Daubert* inquiry focuses on principles and methodology, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

## III.     Analysis

The City argues that Rev. Rich's work experience does not make him a useful expert because it does not provide him specialized knowledge that will assist the trier of fact; his methodology is flawed; and he makes common sense observations. The Church responds that Rev. Rich is qualified and his testimony is relevant and reliable.[2]

### A. Qualifications

The City argues that Rev. Rich does not have "specialized knowledge" and the analysis he did for the Church here is not the same as the church assessments he has done before. (Dkt. 156 at 4-5). Under Federal Rule of Evidence 702, an expert may be qualified "by knowledge, skill, experience, training or education." Fed. R. Evid. 702. An expert does not need to have "particular credentials" or offer "scientific" testimony

---

[2] The Church's argument that, in essence, the Court need not apply *Daubert* is not correct. (Dkt. 167 at 4). *See Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony.") (emphasis in original). It is true, however, that the *Daubert* analysis is a flexible one, and that because there are "many different kinds of experts, and many different kinds of expertise, the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors." *Id.* at 521, 526 (cleaned up).

as long as the testimony is within his competence. *See Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (citations omitted).

Rev. Rich has a Master's degree in ministry leadership. (Rich Rep. at p. 15). He has worked at the Midwest District of the Christian and Missionary Alliance for twenty-four years and has been the District Superintendent there for 12 years. (*Id.*). He was a pastor of a church for four years. (*Id.*). He has twenty-four years of experience providing oversight and coaching for individuals and teams establishing 39 new churches. (*Id.* p. 1). He has supervised "scores" of existing churches and hundreds of pastors "in seeking to design and provide ministry environments" and "presenting a pleasant and peaceful setting for worship, study, fellowship and service." (*Id.* at pp. 1-2). Rev. Rich received training from and conducted seminars for "Growing a Healthy Church", a nationally recognized organization aimed at improving church health and helping churches grow. (Rich Dep. (Dkt. 156-1, pp. 15-16)). At the time of his deposition, Rev. Rich was actively working with approximately 63 churches in Illinois and Indiana, including 30 churches in Illinois, about 75% of which are in the Chicago metropolitan region. (*Id.*, p. 20).

The City concedes that Rev. Rich "undoubtedly engage[s] in useful practical 'church health' work with churches in good times and through trials and tribulations." (Dkt. 156 at 5). However the City contends that Rev. Rich's specific knowledge of the Church is limited and the analysis he did on the Church is not the same as the analysis he has done for other churches (this argument overlaps with the reliability inquiry, discussed further below). (*Id.*).

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted). The question is whether the expert's qualifications "provide a foundation for [him] to answer a specific question." *Id.* at 617 (cleaned up). The Court finds that Rev. Rich's knowledge, skill, training, experience, and education qualify him to offer the opinions he does here. His past experience consulting with churches and assessing specific factors impacting "church health" provide a foundation for him to opine about the impact on the Church of being delayed in purchasing the property. *See United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017) ("the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.") (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("Trained experts commonly extrapolate from existing data.") *(*quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997).

## B. Reliability

Reliability "is determined on a case-by-case basis." *C.W. ex rel. Wood*, 807 F.3d at 835. It is a "flexible" test. *Kumho Tire Co.*, 526 U.S. at 141. An expert's conclusions should be based on "sufficient facts or data." Fed. R. Evid. 702(b). An expert's methodology cannot be based on mere speculation, *Timm v. Goodyear Dunlop Tires*

*N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019), and an opinion "connected to existing data 'only by the *ipse dixit* of the expert' [] is properly excluded under Rule 702." *Gopalratnam*, 877 F.3d at 781 (cleaned up).[3]

Rev. Rich's methodology was based on: (1) his experience; (2) online articles he researched; (3) reading the deposition of Pastor Carter and meeting with him; and (4) data from three churches he identified as being similar to the Church. (Rich Rep. at pp. 1-8; Rich Dep. at p. 77). From his own "personal and denominational experience" Rev. Rich discovered "people feel a sense of peace and confidence when they can realize permanent attachment to a building or location where they gather with other worshipers," and that contributed to people financially supporting the church and helping to grow its membership. (Rich Rep. at pp. 5-6). He described his first-hand experience with factors that help churches maintain members and then described findings from "online articles [that] speak further to this reality." (*Id.* p. 2). From these articles Rev. Rich identified a consistent theme—a connection between the "retention of visitors and the appearance of church facilities to either a positive or negative experience for these guests." (*Id.* p. 5).

In addition, Rev. Rich identified "three specific Chicago area scenarios" that illustrated what happens when a church acquires a permanent home. (*Id.* pp. 6-8). These churches were of similar size to the Church and two were in urban settings, one within the Chicago city limits. (*Id.* p. 8). He retrieved data about these churches

---

[3] "We give the court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (emphasis in original).

from the Christian and Missionary Alliance Annual Church Report Database. (*Id*.).
Based on the data about their yearly service attendance and offerings/income, as it
related to the timing of the church acquiring a permanent location, Rev. Rich
concluded that there was no reason to believe that "Immanuel Baptist would have
not enjoyed similar growth dynamics in attendance and financials had they not been
hindered by the [City] Parking Regulations in acquiring ownership of the facility
located at 1443 W. Roosevelt Road." (*Id*.). Rev. Rich noted that when the Church was
able to finally purchase the property, its service attendance grew by 24%. (*Id*.). Based
on that data and data from the three other churches, he opined that had the Church
not been hindered by the Parking Regulations, it is "exceedingly likely that [the
Church] would have grown in worship service attendance by at least 20% each year."
(*Id*.). Based on the financial growth rates of the three other churches, applying the
20% annual increase, Rev. Rich estimated the offerings for the Church in 2017 and
2018, which amounted to a total loss of $125,834 for those two years. (*Id*. p. 9). In
other words, had the Parking Regulations not prevented the Church from purchasing
the property (which then stalled necessary repairs and renovations), it would have
made $125,834 more. (*Id*. pp. 9-10). The delay in purchasing the property, caused by
the City Parking Regulations, caused among other things: "an unacceptable level of
deferred maintenance" which created an uninviting atmosphere; an environment
that hindered retaining current members or acquiring new ones; and stifling of the
financial health and church growth. (*Id*. pp. 12-13).

The City argues that Rev. Rich's methodology is not reliable. It argues that Rev. Rich arbitrarily selected online articles and failed to evaluate the impact of the other factors identified in the articles on the Church's growth. The City also contends that the sample size for comparative churches was too small, Rev. Rich did not consider data from comparable churches that failed, and he did not factor in other potentially relevant reasons for the Church's lack of growth. The Court finds that Rev. Rich appropriately relied on his own substantial experience, articles by other leaders in his field, data from a national database about three churches he identified as comparable, and the Pastor's deposition. And Rev. Rich established a rational connection between his experience and these sources and his opinions.

As to the City's critique of Rev. Rich's reliance on the online articles, he did not purport to use the articles as a "scientific test"; rather, he explained that his review of the articles, authored by individuals he viewed as authoritative in his field, confirmed his personal and professional experience working with churches. As the Supreme Court stated in *Kumho Tire Co.*, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." 526 U.S. at 156. Indeed "an expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). *See also Schuring v. Cottrell, Inc.*, 244 F. Supp. 3d 721, 730 (N.D. Ill. 2017) (reliable methodology can be based on "personal experiments or observations."); Advisory Committee Notes to Fed.R.Evid. 702 ("[s]ome types of expert testimony will not rely on anything like a scientific

method....Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.").

This is not a case where an expert simply assumed his opinion to be true and failed to substantiate it. *See Kirk v. Clark Equip. Co.*, 991 F.3d 865, 876 (7th Cir. 2021). Nor is it a situation like in *Second Amend. Arms v. City of Chicago*, relied on by the City, in which the expert, opining about profitability of a firearms retailer's stores, admitted that his opinions were not based on "*any data or method*" and were in fact based on a lack of data. 2020 WL 1157347 at *11 (N.D. Ill. Mar. 10, 2020) (emphasis added).

Rev. Rich explained his approach in reviewing factors in the online articles that he believed to be most pertinent to the Church and he explained how and why he selected the three churches he believed to be comparable to the Church and the data he relied on from those churches. The City might be right that Rev. Rich could have evaluated more factors discussed in the articles, accounted for the Church's demographics, or could have used a larger or different sample size of comparable churches.[4] But "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual

---

[4] The City also takes issue with Rev. Rich testifying that the "desired rule of thumb for increase in attendance" is 10 percent (Rich Dep. at p. 156), but still concluding that the Church's attendance would have grown by 20 percent. However, Rich did not testify that 10 percent was an average, but that it was *desired* growth when he is working with a church. Also, he explained how he arrived at the 20 percent number—by taking the lower of the three comparator churches (20-74%) and accounting for the Church's actual 24% growth after purchasing the property. (*Id*. at p. 177).

matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Wilda v. JLG Indus., Inc.*, 2021 WL 392705, at *3 (N.D. Ill. Feb. 3, 2021) ("a failure to look at this or that is not a reason to keep an expert out of a case").

### C. Relevance

Finally the City makes a cursory argument about relevance—that Rev. Rich's observation that if the Church were more attractive it would have drawn and retained more members is merely common sense. Rule 702's relevance standard is "liberal," and includes evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence." *Daubert*, 509 U.S. at 587 (citing Fed. R. Evid. 401); *see also Smith*, 215 F.3d at 718–19 ("Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the [trier of fact], that testimony satisfies *Daubert*'s relevancy requirement.).

The Court finds his testimony will assist the trier of fact (the Court) to understand the evidence or to determine a fact in issue. One relevant issue in the case, for example, is whether the City imposed a "substantial burden" on the Church's religious exercise under the RLUIPA. Rev. Rich does more than offer common sense observations. Based on his experience consulting with churches and based on data

from comparable churches, he provides his views about the Church's attendance and finances as a result of the City parking regulations.

## IV.   Conclusion

For the stated reasons, the City of Chicago's motion [156] is denied.

ENTER:

Dated: April 30, 2021

MARY M. ROWLAND
United States District Judge