IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IMMANUEL BAPTIST CHURCH,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO,<br><br>Defendant. | Case No. 17-cv-0932<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Immanuel Baptist Church brought this suit against the City of Chicago alleging that the City's parking regulations violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (2000). The Court held a bench trial in January 2023. For the reasons explained below, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), and enters judgment in favor of Immanuel Baptist Church.

## STANDARD

Under Rule 52(a)(1), in "an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Having considered the parties' stipulations, the evidence and testimony at trial, and the parties' post-trial submissions [259–62], the Court enters the following findings of fact and conclusions of law. The Court's findings are informed by its assessment of witness credibility and weighing of the evidence. *See Johnson v. United States*, 65 F. Supp. 3d 595, 598 (N.D. Ill. 2014).

As explained herein, the Court finds that the Church has met its burden of proof that the City is liable under RLUIPA, but the Church's damages are limited to $14,590.00.

## BACKGROUND

**I. Procedural History**

The Court briefly recounts the procedural history in this case.[1] In August 2019, Plaintiff Immanuel Baptist Church ("the Church") filed its Third Amended Complaint ("TAC"), alleging that Defendant City of Chicago ("the City") "imposes more demanding parking requirements on religious assembly uses than on non-religious assembly uses." (Dkt. 107, TAC ¶1). The Church alleged that it was unable to satisfy the City's parking requirements and as a result lost revenue, potential new members, and the opportunity to own the two properties where it was located.

The three-count TAC alleged violation of RLUIPA's equal terms and substantial burden provisions and violation of the Fourteenth Amendment's equal protection clause. In 2017, the Court granted summary judgment to the City on the equal protection claim and on the facial challenge under RLUIPA. In March 2022, this Court ruled on the parties' cross motions for summary judgment: it denied the Church's motion, and granted the City's motion as to the RLUIPA equal terms claim and denied the City's motion as to the RLUIPA substantial burden claim (Count III). Thus by the time of trial in January 2023, the sole remaining claim was the Church's RLUIPA substantial burden claim.

---

[1] This opinion otherwise assumes familiarity with the Court's prior rulings and the procedural history of this case.

**II. The Trial**

The bench trial was held over the course of four days. At trial, the Church presented the following witnesses: Pastor Nathaniel Carter, attorney Richard C. Baker, Ben Bargfrede, and expert Jonathan Rich. The City called witnesses Chicago Zoning Plan Examiner Noah J. Szafraniec and the City's Department of Planning and Development Assistant Commissioner Patrick Murphey. The testimony of the property owner and landlord Almarie Burton was entered by deposition transcript excerpts.

## ANALYSIS

I.     **RLUIPA's Substantial Burden Provision**

Under RLUIPA's substantial burden provision:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
> (A) is in furtherance of a compelling governmental interest; and
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

As in *World Outreach Conf. Ctr. v. City of Chicago*, here, the Court "can ignore the 'unless' clause, as the City's argument is limited to denying that it imposed a substantial burden on [the Church's] religious activities; it does not assert 'a compelling governmental interest' in doing so or deny that [the Church] is indeed a religious institution." 787 F.3d 839, 840 (7th Cir. 2015). As to "religious exercise" RLUIPA defines that term as "any exercise of religion" including "the use, building,

or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7). RLUIPA is construed broadly. *See* 42 U.S.C. § 2000cc-3 ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."). *See also Holt v. Hobbs*, 574 U.S. 352, 356–58 (2015) (noting the broad protection intended by Congress in enacting RLUIPA).

For a substantial burden claim, the "scope of application" states in relevant part:

> This subsection applies in any case in which…the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2)(C). The Church's burden at trial was to prove its RLUIPA substantial burden claim by a preponderance of the evidence. In other words, the trier of fact "must believe that it is more likely than not that the evidence establishes the proposition in question." *Am. Grain Trimmers, Inc. v. Off. of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999).[2]

## II. Findings of Fact

It is undisputed and stipulated that:

- The City, through its City Council, is responsible for the enactment of the ordinances at issue in this case [260 ¶ 3]
- The Church is located in Planned Development 896 ("PD 896"). *Id.* ¶ 6.

---

[2] The parties agree that the preponderance of the evidence standard applies. *See* [261]; [262]. *See also Versatile v. Johnson*, No. 3:09CV120, 2011 WL 5119259, at *4 (E.D. Va. Oct. 27, 2011) (collecting cases), aff'd, 474 F. App'x 385 (4th Cir. 2012); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield, Connecticut*, No. 3:09-CV-1419 (JCH), 2017 WL 5015624, at *14 (D. Conn. Nov. 2, 2017).

4

- Municipal Code of Chicago ("MCC") § 17-10-207-I requires that buildings used for religious assembly have one off-street parking spot for every 8 seats of occupancy. *Id.* ¶ 14.
- At the time of the purchase of the property, the Church's occupancy permit allowed for 146 people. Thus, under MCC § 17-10-207-I, it was required to have 19 parking spots. *Id.* ¶ 15.
- The City did not prohibit the Church from holding its religious services at 1443 W. Roosevelt, even though the Church did not obtain the required off-street parking until the summer of 2018. *Id.* ¶ 16.
- The Church entered into a License Agreement ("License") with SP Plus Corporation to obtain the required off-street parking pursuant to § 17-10-0207-I. The term began on August 1, 2018, and was to last until July 30, 2028. The Church paid SP Plus Corporation $400 per month for the License with a 3% annual escalator. *Id.* ¶ 22.
- The City passed an ordinance, effective March 13, 2019, extending the exemption from parking requirements under MCC § 17-10-0207-I to properties within 1,320 feet from the centerline of certain bus routes. *Id.* ¶ 23.
- On March 5, 2019, the City informed the Church that the new ordinance might make the Church eligible for a complete parking reduction due to its proximity to a rapid transit bus line on Ashland Avenue. *Id.* ¶ 24.
- The Church paid a $1,500 fee to apply for this new exemption. *Id.* ¶ 25.
- On June 17, 2019, the City approved a minor change to PD 896 which reduced Plaintiff's parking requirement to zero. *Id.* ¶ 26.

The Court also adopts and incorporates the other undisputed facts set forth in the Church's opening brief [260 ¶¶ 1-26].

### III. Conclusions of Law

The following are the Court's conclusions of law. First is the question of whether RLUIPA applies, and then whether the City imposed a substantial burden on the Church.

#### A. RLUIPA Applies in this Case

The City argues that RLUIPA does not apply because it did not engage in an "individualized assessment" in this case. Instead, according to the City, the Church challenges the City's generally applicable parking requirement for religious

5

assemblies. The Church counters that the City engaged in an individualized assessment with regard to the Church's attempt to comply with the parking requirement. The Court finds that RLUIPA applies here.

This case involves the zoning regulations in the Municipal Code of Chicago ("MCC"), in particular § 17-10-207, which sets forth requirements for off-street parking which vary by zoning district and property use. While a parking ordinance may be general and neutral, a city's application of the ordinance to a church based on consideration of the church's individual case can be an "individualized assessment." *Church of Scientology of Georgia, Inc. v. City of Sandy Springs, Ga.*, 843 F. Supp. 2d 1328, 1352 (N.D. Ga. 2012). If the application of the government regulation "does not involve a mere numerical or mechanistic assessment, but involves criteria that are at least partially subjective in nature," the government's application of the regulation or ordinance can constitute individualized assessment. *Id.* at 1351 (cleaned up). The Second Circuit in *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, explained that RLUIPA applies "when a governmental entity conducts a 'case-by-case evaluation'…carrying as it does 'the concomitant risk of idiosyncratic application' of land use standards that may permit (and conceal) 'potentially discriminatory' denials." 768 F.3d 183, 193 (2d Cir. 2014). *See also Westchester Day Sch. v. Mamaroneck*, 417 F. Supp. 2d 477, 541-42 (S.D.N.Y. 2006) ("the determination of whether the governmental action is an 'individualized assessment' depends on whether the decision was subjective in nature."), *aff'd*, 504 F.3d 338 (2d Cir. 2007).

6

Previously, on summary judgment, this Court rejected the City's jurisdictional challenge, finding the City's decision with regard to the Church was not merely a generic calculation. [202]. The evidence at trial confirmed that the City conducted an individualized assessment of the property in this case.[3]

The City's own post-trial briefs belie its position that it mechanically applied the MCC's parking ratio rule to the Church. The City concedes that: its determination of "whether a parking solution substantially complies with the MCC is admittedly discretionary"; its Department of Planning and Development (DPD) "exercised all its available discretion to help the Church come into compliance with the law," it used discretion to approve the Church's use of the Fosco Park parking lot in 2018; and it "accommodated the Church at every available juncture." [259 at 17, 18, 22; 261 at 6]. Still, the City insists that officials could not waive the requirements in MCC § 17-10-207. But the question is not whether in theory the requirement could be waived, but whether the City's determination that the Church did not (and then did) comply with the MCC's parking requirement was an individualized assessment. It was.

The trial testimony of Mr. Murphey and Mr. Szafraniec confirmed this. Mr. Murphey testified that parking rules in the Municipal Code allow for "substantial compliance," as opposed to strict compliance. (Tr. at p. 463-64); [259 at 16]. He also explained that "planned developments allow for a lot of flexibility based on the circumstances." (Tr. at p. 465). Mr. Szafraniec testified that the parking rules applicable to the Church allowed the Zoning Board to consider a variation and the

---

[3] Because of this finding the Court need not address the Church's alternative argument that the City's actions affected interstate commerce.

7

DPD to consider "substantial compliance" or "flexibility." (*Id*. at p. 411). Specifically, he explained:

> when looking at the parking obligations for the church and then considering where else they could locate, we would use the underlying zoning designations. The underlying zoning designations in the parking chapter state that you should locate within 600 feet. The code further offers a variation or where you could go to the Zoning Board of Appeals and you can ask for a 25 percent increase to that distance, or up to 750 feet.
> But then further, a defined ordinance for a planned development gives additional process. That additional process allows the department to consider substantial compliance or flexibility in the application of these rules and regulations via the minor change process to authorize something reasonable to get compliance with the requirements of the PD ordinance, in this case providing the parking somewhere in the general vicinity of the church.

*Id*. In 2016, Mr. Szafraniec told Pastor Carter that a "potential path" to the Church being completely exempt from the parking requirement was if there was a "preexisting nonconforming legal use." (*Id*. p. 373). Other DPD communications underscore the subjective nature of the process: In emails to Pastor Carter in 2016, Mr. Murphey communicated that the DPD "would have to determine if a religious assembly use is something [the Department] wants to promote on a commercial corridor such as Roosevelt Road." (*Id*. p. 508). In June 2016, Murphey told the Church that "[o]ne of the outcomes of our search *may be* that you can legally establish this church *without providing parking*." (*Id*. p 440, emphasis added). And after the Church finally secured a parking lot in 2018, the City informed the Church in 2019 that a new ordinance *might* make it eligible for a complete parking reduction. [260 ¶ 24].

For support, the City relies on *Lighthouse Cmty. Church of God v. City of Southfield*, 2007 WL 30280 (E.D. Mich. Jan. 3, 2007). The *Lighthouse* court

8

acknowledged that a case can involve a neutral law but the "application to particular facts nevertheless can constitute an individualized assessment particularly where…the application involve[es] criteria that are at least partially subjective in nature." *Id*. at *5. There, while the city's zoning interpretation of the parking regulation was a numerical application, the Zoning Board's denial of the church's application for a parking variation was an individualized assessment. *Id*. at *7. "[S]ince the ZBA is able 'to authorize relaxation of the ordinance provisions and to grant variances in certain cases,' there is an individualized assessment." *Id*.

Similarly, here, the evidence at trial showed that while MCC § 17-10-207 contained a set formula, the City's assessment of the Church's parking compliance was not merely mechanical. The way the City applied its parking rules to the Church involved discretion and consideration of factors that were not purely formulaic.

According to the City, its decision in 2018 that the Fosco Park Lease satisfied the Church's parking requirement was "admittedly discretionary." [259 at 17]. The City insists, though, that the Church's issue is with MCC § 17-10-207, not § 17-8-901, and § 17-8-901 only came into play in April 2018 "well after the Church was allegedly burdened." *Id*. The Court is not persuaded by this attempt to distinguish subsections of the MCC's parking rules. The operative complaint and evidence at trial confirm the Church was challenging the City's application of its parking regulations to the Church over a period several years.[4] The City also concedes that the time period for

---

[4] The City does not argue that evidence at trial was "not within the scope of an issue raised in the complaint." *Reynolds v. Tangherlini,* 737 F.3d 1093, 1106 (7th Cir. 2013). The TAC alleges that after learning that the City might accept a parking arrangement more than 600

9

damages, meaning period during which the Church experienced the alleged burden, is June 15, 2016 to September 25, 2018. Finally, the Church *did* tie the 2018 decision (applying § 17-8-901) to allow the Fosco Park Lease to its burden. The Church initially understood from the City that the 600 foot requirement was strict, but then learned that the City might relax to 600-feet requirement via a "minor change", which is what prompted it to invest time and resources into searching for options like Fosco Park. (Tr. at p. 64, 244, 421-22).

In sum, considered as a whole, the evidence at trial showed that the City's application of the parking requirements to the Church involved layers of complexity, flexibility and discretion. The process was certainly "at least partially subjective in nature." *Lighthouse Cmty. Church*, 2007 WL 30280 at * 5. The Church therefore met its burden to show by a preponderance of the evidence that the City engaged in an individualized assessment, and RLUIPA applies.

**B. Substantial Burden**

Next is the question whether the City imposed a substantial burden on the Church. Although RLUIPA does not define "substantial burden," the Seventh Circuit has explained that the term is "relative" and "depends on its magnitude in relation to the needs and resources of the religious organization in question." *World Outreach Conference Ctr. v. City of Chi.*, 591 F.3d 531, 539 (7th Cir. 2009). Courts consider a church's needs and resources in relation to the burden and whether the church

---

feet away, the Church began a long process to find parking which culminated in the shared parking agreement for the Fosco Park lot in 2018. (TAC ¶¶ 51-57). The City approved this arrangement, allowing the Church to finally close on the property. *Id.* And at trial *the City*'s witnesses discussed at length § 17-8-901 (*See* Tr. at p. 411, 420, 463-67).

10

experienced "delay, uncertainty, and expense." *Id*; *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005). The Seventh Circuit has explained that the burden must "seriously violate" the plaintiff's religious beliefs, but it need not render the religious exercise "effectively impracticable," as the Supreme Court "articulate[d] a standard much easier to satisfy." *Schlemm v. Wall,* 784 F.3d 362, 364 (7th Cir. 2015).

Here, the Church met its burden at trial to show that the City imposed a substantial burden on it. The City burdened the Church's ability to effectively use and convert the building and develop and grow its ministry when it was prevented from purchasing the two properties. For two years the Church was not able to own any of the property, and then later it purchased one of the two buildings, but not the entirety of the property, it attempted to purchase in 2016. The Church also spent significant resources and money attempting to comply with the parking regulations.

In particular, the trial evidence showed that the Church was a small church and had limited resources. The City does not dispute that the Church had limited resources, arguing only that this "does not excuse religious uses from the expense of complying with zoning regulations." [261 at 11]. The Church experienced uncertainty over a number of years caused by inconsistent messages from the City about the parking requirements and how they might apply to the Church. Pastor Carter spent significant resources trying to find a parking solution, and he felt distracted from his leadership of the ministry. The Church lost additional ministry opportunities that the additional building would have afforded. The Court found credible Carter's

11

testimony and Ben Bargfede's testimony that this process was disruptive both practically and emotionally to the Church over an extended period of time.

The City raises several arguments that are not persuasive in light of the case law, the evidence, or both. First, the City contends that only under "extraordinary circumstances" could zoning regulations impose a "substantial burden" on religious exercise. But the case law the City relies on does not hold that "extraordinary circumstances" are required to find a substantial burden. The Seventh Circuit has advised that under RLUIPA, the "adjective 'substantial' must be taken seriously." *World Outreach*, 591 F.3d at 539. At the same time, the Supreme Court explained that "Congress enacted RLUIPA…to provide very broad protection for religious liberty." *Holt*, 574 U.S. at 356 (cleaned up). And courts recently have stressed that "[w]hatever 'substantial' means, it most assuredly does *not* mean complete, total, or insuperable." *Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama*, 980 F.3d 821, 830 (11th Cir. 2020).[5]

Next, the City argues that any burden was "self-inflicted." This factor "reflects that, when a plaintiff has good reason to know in advance that its proposed usage will be subject to an onerous review process, the burdens of that process are not likely to count as substantial." *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp., Michigan*,

---

[5] As this Court has noted before, since the Supreme Court's decisions in *Holt* and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), courts have acknowledged a less stringent standard applied to the substantial burden inquiry. *See Affordable Recovery Hous.*, 2016 WL 5171765; *see also Thai Meditation,* 980 F.3d at 830; *City Walk - Urb. Mission Inc. v. Wakulla Cty. Fla.*, 471 F. Supp. 3d 1268, 1283 (N.D. Fla. 2020); *Schworck v. City of Madison*, No. 19-CV-312-WMC, 2021 WL 1820779, at *13 (W.D. Wis. May 6, 2021) ("the Supreme Court's definition of 'substantial burden' is obviously controlling), aff'd as modified, No. 21-2055, 2022 WL 832053 (7th Cir. Mar. 21, 2022).

82 F.4th 442 (6th Cir. 2023). The City contends that the "the Church was aware of the parking requirement as early as 2011, but chose not to comply with it," instead "wait[ing] until 2016 — when it wanted to purchase the property — to make any effort to comply." [259 at 22]. The City maintains that any delay in the purchase of the property resulting from the Church's "noncompliance with the requirements [was] entirely its own fault." *Id.* at 23.

Painting the Church's burden as entirely self-inflicted is not supported by the trial evidence. For years, the City did not take any enforcement or punitive measure against the Church or landlord with regard to parking. The parking requirement only became an issue when the Church, in response to its lender's request, sought a letter from the City in 2016. The City also did not prevent the Church from holding its services at 1443 W. Roosevelt, even though the Church did not secure the required off-street parking until 2018. In addition, the City's argument does not account for the fact that the Church *rented* the property from 2011 to 2018; it was (non-party) Ms. Burton who was the *owner*.[6] Although Pastor Carter became aware of a parking requirement in 2011, the Court found credible his testimony that he believed the landlord Ms. Burton (and her lawyer) initiated and took care of ensuring a church was properly located on the property. (Tr. p. 132-35). Pastor Carter credibly testified that he was assured that the Church could operate at that location since a church had operated on the site previously. Two official City documents also reassured the

---

[6] The parties did not address who was legally obligated to comply with City's zoning ordinances related to parking during that period, and the Court need not wade into that issue.

Pastor: a September 2011 letter from the City's Bureau of Planning and Zoning stating that "the establishment of a religious assembly use at 1445-1447 West Roosevelt Road is permitted," and an occupancy permit issued by the City to the Church in 2012. [JX11; PX34]. The City does not argue that the Church had no reasonable expectation of using the property for religious purposes. *See Canaan Christian Church v. Montgomery Cnty., Maryland*, 29 F.4th 182, 194 (4th Cir. 2022), (burdens on a religious organization may not be self-imposed where the organization "acquires land with a reasonable expectation of land use but the government subsequently makes development and use practically impossible."), cert. denied sub nom. 143 S. Ct. 566 (2023). Nor does the City cite any safety or public-interest justification, distinguishing this case from *Affordable Recovery Hous. v. City of Blue Island*, where the Court found the city had an "honest concern with possible fire hazards to the residents", and the recovery home assumed some risk by "rush[ing] headlong into business." 860 F.3d 580 (7th Cir. 2017).

The City next argues the burden was not significant. The City relies on *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003). There the Seventh Circuit explained that it was not a substantial burden for churches to spend considerable time and money to find an affordable location in an appropriate zone in Chicago. But the Church's complaint here is not about general costs of searching for land in the city. *Cf. Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 786 (D. Md. 2008) (substantial burden found where congregation presented evidence showing defendant's actions led congregation to spend substantial funds and

14

resulted in delay and uncertainty), aff'd, 368 F. App'x 370 (4th Cir. 2010); *see also New Berlin*, 396 F.3d at 901 ("[t]hat the burden would not be insuperable would not make it insubstantial."). Further, the evidence showed the Church made significant efforts to work with City officials and try to comply with City requirements. *See Irshad Learning Ctr. v. Cty. of Dupage*, 937 F. Supp. 2d 910, 948 (N.D. Ill. 2013) (finding it significant in assessing substantial burden claim that the religious institution tried to meet the demands of both planning staff and elected officials).

Finally, the City contends that there was no animus or arbitrary behavior. In *New Berlin,* the Seventh Circuit noted that the "repeated legal errors by the City's officials casts doubt on their good faith", and concluded that the burden on the church was substantial. 396 F.3d at 899, 901. However that case did not hold that evidence of animus or bad faith is required to find a substantial burden under RLUIPA (which, the Church points out, does not contain the terms "animus" or "bad faith"). The City has not cited a controlling case law for that proposition. The City cites a passage in *Thai Meditation*, [259 at 22], where the Eleventh Circuit explained that one factor in considering substantial burden was whether the city's decision-making process reflected "*any arbitrariness* of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around." 980 F.3d at 832. Although the Court did not find evidence of intentional bad faith, the trial evidence did reflect a level of arbitrariness and disregard, supporting a finding that the burden was substantial. For example Szafraniec conceded that the Church in 2011 could have found parking more than

15

600 feet away, though he had no recollection of informing the Church of that fact before 2016, and Murphey admitted to questioning in 2016 (after the Church had been operating on the property since 2011 and another church before that) whether a religious assembly use is something the DPP wanted "to promote on a commercial corridor such as Roosevelt Road" and whether the "continued presence of a religious assembly" in that area was "appropriate." (Tr. p. 508-11).

Considering the evidence as a whole, the Court finds the burden was substantial. The Court next turns to whether the Church met its burden of proof with regard to damages.

**C. Damages Attributable to the Substantial Burden Imposed by the City**

The Church seeks a total of $415,509.37 in damages. The Church asserts that it demonstrated at trial that all of its damages were caused by the City's actions which delayed the Church purchasing the properties in 2016. In response, the City argues that the Church did not meet its burden to prove RLUIPA damages traceable to the City's conduct, and most of the categories of damages are unsubstantiated or not recoverable. It is the Church's burden to prove that it suffered damages and to "establish a reasonable basis for computation of those damages." *Assaf v. Trinity Med. Ctr.*, 821 F.3d 847, 848 (7th Cir. 2016).

The Church seeks the following damages:

- $50,980.00 in increased rent on the 1443 Building from June 2016 to closing of purchase;
- $107,500.00 in the loss of the 1447 Building;
- $12,495.37 in pre-litigation legal fees;
- $13,800 to lease the Fosco Park parking lot for one year and cancellation fee
- $2,580.00 in increased mortgage payments;

16

- $790.00 in increased insurance premiums;
- $780.00 in expenditure of time to secure additional parking;
- $750.00 in administrative fees;
- $125,834 for lost income per Rev. Rich's expert report;
- $100,000 *Watseka/Fifth Baptist* damages;
- Reasonable attorneys' fees to be determined by the Court.

The Court first denies the Church's request for "*Watseka/Fifth Baptist*" damages. The Church cites only two cases to argue it is entitled to these damages, a case from 1883, *Baltimore & P. R. Co. v. Fifth Baptist Church*, 108 U.S. 317 (1883), and *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547 (7th Cir. 1986), aff'd, 479 U.S. 1048 (1987). Neither case, however, involved or discussed RLUIPA. The Church does not cite any authority that the Court should extend these cases to the present one. Thus the Court finds that the Church has not met its burden to show it is entitled to these damages.

Next, the Church requests $50,980.00 in increased rent resulting from the Church's inability to purchase its building in 2016. The Court agrees with the City that the evidence did not show that the City caused this increase in rent. Pastor Carter testified that the Church chose to make this "good-faith gesture" to appeal to Ms. Burton to "hang with us a little bit longer" with regard to buying the building. (Tr. at p. 47). The Church also does not explain how its agreement in 2017 with Ms. Burton to pay her a lump sum is attributable to the City—Carter testified the purpose of this payment was to "help [Ms. Burton] with some [expenses]." (*Id.* p. 72). There is no evidence that the City caused the Church to pay increased rent. Carter even explained his thinking in 2017 that: "If [this] lawsuit goes through, we could potentially recoup this extra rental expense in damages awarded." (*Id.* at 182).

17

Next is the $107,500.00 the Church claims for the loss of the 1447 Building. However the Court pointed out at trial, and Pastor Carter conceded, that the Church did not pay this amount because it did not buy 1447 Roosevelt. (Tr. at p. 107). The Church argues this was "the value of its bargain" but does not cite any authority to support awarding these (non-incurred) speculative damages. For the same reason the Court finds the Church's claimed $2,580.00 in increased mortgage payments to be speculative. As to the request for $12,495.37 in pre-litigation legal fees, while wise for the Church to hire an attorney, this does not mean that these were damages attributed to any burden imposed by the City. The Church also concedes that some of these fees were counsel's transactional work to help the Church purchase 1443 W. Roosevelt Road. [259 at 40]. Further, the Church does not cite any specific support in the record for the $780.00 "in expenditure of time to secure additional parking" or the $750.00 in administrative fees. Pastor Carter's testimony about quantifying his time for this category was vague. (Tr. at p. 110).

As to the claimed $125,834 for lost income, the Church relies on its expert Reverand Rich who had provided an expert report and testified at trial. The Court did not find that barring Mr. Rich as an expert in this case was warranted.[7] However, Mr. Rich's testimony at trial showed, particularly after further questioning by the City, that his methodology underlying his particular calculations was not reliable. [254]. An expert's conclusions should be based on "sufficient facts or data." Fed. R.

---

[7] This Court did previously explain the potential weaknesses in Reverand Rich's testimony noting that the City "might be right that Rev. Rich could have evaluated more factors discussed in the articles, accounted for the Church's demographics, or could have used a larger or different sample size of comparable churches." [178 at 10].

Evid. 702(b). All three comparator churches Mr. Rich relied on, for example, moved into a new or newly renovated building, which was different from the Church. (Tr. at p. 309). Although he testified about the Church's attendance, he admitted he also did not review the Church's actual attendance figures and did not even know how the church keeps track of attendance. (*Id*. at p. 329). He conceded that much of the basis for his calculation was "simple math" without further substantiation. In short, Mr. Rich did not "establish a reasonable basis for computation of those damages." *Assaf*, 821 F.3d at 848. The Court will not allow an award of $125,834 for lost income.

Finally, the Church has met its burden to recover the $13,800 paid for the lease for the Fosco Park parking lot. The Church secured this lease after its 2016 deal fell through, and then it invested significant efforts to comply with the City's rules and to try to follow officials' advice. Renting this parking lot allowed the Church to finally purchase the building. The amount is one year's worth of a lease and the cancellation fee, as well as the associated $790.00 in increased insurance premiums. While the City is correct that Court ruled pre-trial that the relevant time period for damages was June 15, 2016 to September 25, 2018 [238 at 2], this Court's ruling did not foreclose other categories of damages (which the Church had categorized as "hard damages"). And the Fosco Park lease was dated August 1, 2018, within this time period. The Court finds that damages flowing from that lease – the monthly payments as well as the later $9,000 cancellation fee – are recoverable.

19

## CONCLUSION

Based on the evidence at trial, the Court finds in favor of Immanuel Baptist Church and against the City of Chicago on the Church's RLUIPA substantial burden claim. The Court finds that the Church's damages are limited to $14,590.00. Accordingly, the Court enters final judgment pursuant to Federal Rule of Civil Procedure 58 in favor of Immanuel Baptist Church. By November 9, 2023, the parties are to file a joint status report regarding Plaintiff's motion for fees pursuant to Fed. R. Civ. Pro 54 and LR 54.3. Civil case terminated.

E N T E R:

Dated: October 30, 2023

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge